GERBER, J.
The defendant appeals from her conviction for second degree murder and possession of a weapon on school grounds. She argues that the trial court erred in: (1) denying her motion to declare unconstitutional, as applied to juveniles, section 775.027, Florida Statutes (2008), which defines the standard for the determination of insanity; (2) denying her motion to disallow the state’s peremptory strike of a prospective juror; (3) denying her motion to suppress her incriminating statements; and (4) denying her motion for mistrial based on the state’s alleged improper closing argument. We affirm on all arguments raised.
We write to address only the second argument, that is, whether the trial court erred in denying the defendant’s motion to disallow the state’s peremptory strike of a prospective juror. That juror, identified as juror 28, was African-American. The defendant is African-American, and the victim was white. The state exercised five peremptory challenges against African-Americans, with the fifth being juror 23. The defendant primarily argues that, based on the prior strikes which the state exercised against African-Americans, the state’s reason for striking juror 23 was not genuine and thereby deprived her of an impartial jury.
We recognize that prior strikes exercised against the same racial group are relevant to the genuineness inquiry. However, we conclude, based on the record in this case, that the court did not err in finding the state’s reason for striking juror 23 to be genuine. To support our conclusion, we shall provide a detailed account of the record in this case.
Juror 23, like the other prospective jurors, was asked to complete a written questionnaire in advance of voir dire because the case received extensive media attention. The questionnaire sought the prospective jurors’ opinions on a variety of topics, including the insanity defense which the defendant intended to raise at trial. Juror 23’s lack of responses to the questionnaire became the subject of discussion between the state and juror 23 during voir dire. In the interest of completeness, we provide the entire exchange between the state and juror 23:
State: On the jury questionnaire you didn’t answer the questions about whether you had any opinions about law enforcement that would affect the way you viewed the evidence. You didn’t answer the question about children or about guns or about age. So I’m going to have to talk to you a little bit, okay, about that[.] And you indicated you didn’t understand the word insanity, which other people had that problem *818 with as well. When we talk about insanity we talk about people who are mentally ill, okay. And what we’re wondering about is if you have opinions about that before you hear evidence. You can have an opinion after you hear the evidence. We’re concerned about people who have an opinion before they hear the evidence. We’re concerned that you might think being insane is never an excuse for committing a crime or that you think being insane is always an excuse for committing a crime, that’s what we’re looking for. Do you think you have an opinion that would go to either of those extremes?
Juror 23: No.
State: No. Okay. Are you having any trouble understanding us?
Juror 23: I stand — I stand — understand some of it.
State: Uh-huh.
Juror 23: Not a lot.
State: Not all of it?
Juror 23: I understand, but my English [unintelligible] too long.
State: Okay. So it’s just being able to communicate, but understanding, you understand everything that we’re talking about? Because, obviously, it’s really important that you be able to understand everything that’s said in the courtroom. You can’t really evaluate it fairly if you don’t understand it. That’s not a problem for you?
Juror 23: No.
State: Okay. Great. All right. How do you feel about a law that you don’t agree with, would you be able to follow it even if you don’t agree with it?
Juror 23: I’d follow it.
State: Okay. What about law enforcement, do you have any opinions about law enforcement? You said you had some contact with law enforcement, did that leave you with an impression about people who are members of law enforcement?
Juror 23: No.
State: No. Okay. So I don’t have to worry that you have any preconceived ideas about police officers or anything like that?
Juror 23: No problem.
Later during voir dire, the defense spoke with juror 23. We provide the entire exchange between the defense and juror 23 (with interjection by juror 24, who apparently was seated next to juror 23):
Defense: [Juror 23]?
Juror 23: Yes.
Defense: Good. [Juror 23], you indicated — and I’ll try to speak up so you can hear, okay?
Juror 23: My throat.
Defense: Pardon?
Juror 23: My throat is not too good.
Defense: Do you want some water?
Juror 23: No.
Defense: No?
Juror 23: No.
Defense: You’re okay?
Juror 23: I come from a cold I had before, it don’t go out yet.
Defense: I’m sorry?
Juror 24: She had a cold.
Defense: Oh, she had a cold?
Juror 24: Yes.
Defense: Oh, okay. Thank you.
Juror 24: You’re welcome.
Defense: All right. You indicated when Judge Murphy was questioning you yesterday I believe that you work in the nursing department?
Juror 23: Yes.
Defense: Where is that?
Juror 23: In Dania.
*819 Defense: In Dania?
Juror 23: In a nursing home.
Defense: In a nursing home. How long have you been doing that kind of work? Juror 23: 24 years.
Defense: 24 years. And you’re married?
Juror 23: Yes.
Defense: Okay. And what does your husband do?
Juror 23: He work in rent-a-car.
Defense: And what does he do for them?
Juror 23: Rental agent. Rental agent.
Defense: Okay. And again, I’m going to ask you this question, and we can deal with this without — outside the presence of the rest of the jury if you, but you indicated that you had some family experience with domestic violence.
Juror 23: Yes.
Defense: Do you want to — can you tell us about that or would you rather not?
Juror 23: No.
Defense: Okay. That’s fair. You didn’t put a lot on the form here. You’re able to follow everything we’re talking about, you know, I mean, you under — I know the conversation — you can follow everything?
Juror 23: Yes.
Defense: And if you’re seated right there, or right where [juror 10] is, you could hear what was going on from here okay?
Juror 23: Yes.
Defense: And you could follow that okay?
Juror 23: Yes.
Defense: And you could be fair to both sides, in other words, to both the prosecution and to [the defendant]?
Juror 23: Yes.
During jury selection, when the state sought to challenge juror 23, the following exchange occurred between the state, the defense, and the court:
State: Your Honor, I would move to strike [juror 23] for cause. This is the lady that I previously indicated that I felt did not speak English. She didn’t answer anything in writing on the juror questionnaire except for I think like two questions. Although, she when we spoke to her said that she just had trouble expressing herself, that she did understand what was going on, I genuinely believe that she did not. And I think counsel had the same trouble with her, understanding both what she was saying and getting her to be responsive to what we were asking.
Defense: I’d object, Judge. I think she understood everything when I was talking to her, when the Court was talking to her, and she explained to [the state] about the jury questionnaire. And I’d like to point out for the record now [the state] has taken four strikes, all African[-]American, and now [the state is] moving to strike another black juror from the panel, and I’d certainly object as far as cause.
Court [speaking to defense counsel]: Thank you. Counsel, respectfully, I was concerned about [juror 23] as well. However ... you questioned her and went back to her, because I thought you had the same concerns, you were questioning whether she understood, and in your conversation with her she advised the Court she understood. She speaks in a very low, small, soft voice.
Defense: She said she had just gotten over a cold. ■ •
Court: No, I remember. But she did indicate to us she understood. She gave answers that were responsive to the questions posed even if she didn’t volun *820 teer them. So, counsel, I’m not going to excuse her for cause, that’s denied.
State: Well, then I would move to strike her [using a peremptory challenge]. And, anticipating counsel’s objection, I would point out that I do believe — I mean, she wrote down on the [questionnaire] when it came to insanity that she did not know the word insanity. She repeated that when I was talking to her. She didn’t answer virtually anything. And I would ask that the questionnaire be made part of the record, although I know it already is, just so that it reflects that she failed to answer it and it had nothing to do with her ability to speak, and, you know, I felt that she was very, very difficult to understand and that she wasn’t completely responsive to my questions.
Defense: And, I mean, I haven’t made my objection yet, Judge, but since [the state] made it for me, I would move [to disallow the strike]. Again, just so the record’s perfectly clear, [juror 23 is] a black female. [The state] is now attempting to strike the fifth juror, all minority, all black jurors. And, I mean, I don’t think that there’s anything that she said, this juror ... that at all indicates that she can’t be a fair juror. And I think we’re getting into a situation now of profiling, that is not constitutional, and I would object to allowing to striking of [juror 23].
Court: Thank you. Counsel, respectfully, there was a timely objection, whether it was made for you, or however that was done, [juror 23] is a member of a protected class, the State did come forward with race-neutral reasons, I believe they are genuine, not a pretext, and the reason is facially race-neutral. I’m going to grant it. She is excused,
(emphasis added).
After the defendant’s conviction, this appeal followed. According to the defendant, the trial court abused its discretion in two respects: (1) contrary to Melbourne v. State, 679 So.2d 759 (Fla.1996), the record is devoid of a factual analysis in which the court assessed the strike’s genuineness in light of “prior strikes exercised against the same racial group,” id. at 764 n. 8; and (2) to the extent the court found the strike to be genuine, that finding was clearly erroneous. As to the second reason, the defendant argues that the court’s finding was facially contradictory in that the court, in denying the state’s cause challenge, found that juror 23 understood the proceedings, but then, in allowing the state’s peremptory challenge, found that juror 23’s failure to answer questions was a genuine reason to strike her.
We review the trial court’s finding to determine whether it was clearly erroneous or an abuse of discretion. See Hayes v. State, 94 So.3d 452, 465 (Fla.2012) (“[T]he trial court’s assessment [on the issue of pretext] will be affirmed on appeal unless clearly erroneous.”); Nowell v. State, 998 So.2d 597, 602 (Fla.2008) (“[T]he appropriate standard of appellate review for determining the threshold question of whether there is a likelihood of racial discrimination in the use of peremptory challenges is abuse of discretion.”).
We conclude that the trial court’s lack of articulation of its thought process on the issue of pretext was not clearly erroneous or an abuse of discretion. Our conclusion is consistent with our recent holding in Siegel v. State, 68 So.3d 281 (Fla. 4th DCA 2011): “There is nothing in Melbourne which requires trial judges to articulate their thought process on the issue of pretext.” Id. at 286 (citation omitted).
Our conclusion also is consistent with the supreme court’s more recent holding in Hayes:
*821 We acknowledge that the Melbourne procedure does not require the trial court to recite a perfect script or incant specific words in order to properly comply with its analysis under step three. Indeed, there is no requirement that the trial court specifically use the word “genuine.” Nevertheless, Melbourne does not relieve a trial court from weighing the genuineness of a reason just as it would any other disputed fact.
After the trial court determines that the proponent has proffered a race-, ethnicity-, or gender-neutral reason and then proceeds to evaluate that reason’s genuineness, the trial court can easily inquire of the opponent of the strike, who at that point bears the burden of persuasion, to demonstrate why the reason was not genuine. But where ... the trial court thereafter fails to undertake an on-the-record genuineness inquiry, the reviewing court is unable to engage in meaningful appellate review. This is because the appellate court is not a forum for conducting an after-the-fact ... inquiry, and where no inquiry is conducted, deference cannot be shown to a conclusion that was never made.
[[Image here]]
Therefore, where the record is completely devoid of any indication that the trial court considered circumstances relevant to whether a strike was exercised for a discriminatory purpose, the reviewing court, which is confined to the cold record before it, cannot assume that a genuineness inquiry was actually conducted in order to defer to the trial court.... Deferring to the trial court’s genuineness determination on appeal when no such determination has been made invites an arbitrary result.
Interpreting our jurisprudence on this issue, Florida’s appellate courts have fairly consistently reversed for a new trial where the record provides no indication that the trial court engaged in the required genuineness inquiry. Conversely, where the record supports the conclusion that the trial court has actually considered relevant circumstances surrounding the strike, it is proper for the reviewing court to conclude that a finding has been made, notwithstanding that the trial court did not recite a perfect script or incant “magic” words.
94 So.3d at 464 (internal citations, quotations, footnote, and notations omitted).
Here, notwithstanding that the trial court did not recite a perfect script or incant magic words, the record supports the conclusion that the court was presented with relevant circumstances surrounding the strike and made a finding of genuineness. The state proffered a race-neutral reason for striking juror 23, that is, “[S]he wrote down on the [questionnaire] when it came to insanity that she did not know the word insanity. She repeated that when I was talking to her. She didn’t answer virtually anything.” At that point, the defense bore the burden to persuade the court that the state’s race-neutral reason was a pretext. Before the court could expressly communicate that inquiry to the defense, the defense argued that “[The state] is now attempting to strike the fifth juror, all minority, all black jurors. And, I mean, I don’t think that there’s anything that she said, this juror ... that at all indicates that she can’t be a fair juror.” Based on that argument, and based on the voir dire of all of the jurors which the trial court witnessed, the court had a sufficient record to determine whether the state exercised its strike of juror 23 for a discriminatory purpose. The court found that the state’s race-neutral reason was “genuine, not a pretext.”
*822 We conclude that the trial court’s finding was not clearly erroneous or an abuse of discretion based on our review of voir dire as a whole. Our conclusion rests on five grounds: (1) the court’s finding was not facially contradictory as the defendant argues; (2) the state’s proffered reason for striking juror 23 applied to only one other person, who also was stricken, albeit for a different reason; (3) the record indicates that the court considered relevant circumstances in determining whether the state’s proffered reasons for striking other African-American jurors was genuine; (4) this case is distinguishable from Nowell, upon which the defendant relies, where a trial court improperly allowed the state to exercise a peremptory strike; and (5) this case is distinguishable from Siegel and Hayes, where trial courts improperly disallowed defendants from exercising peremptory strikes. We address each ground in turn.
First, the court’s finding was not facially contradictory as the defendant argues. As the state represented, juror 23 did not answer several questions on the jury questionnaire, and in response to the question about the case’s primary issue — the insanity defense — juror 23 indicated that she did not understand the word “insanity.” When the state asked juror 23 if she was “having any trouble understanding us,” she responded “I stand — I stand — understand some of it.... Not a lot.” This response caused the trial court to be “concerned about [juror 23] as well.” In fact, the court thought the defense “had the same concerns” because the defense “questioned her and went back to her.” Only after the defense questioned juror 23 and she “gave answers that were responsive to the questions posed” did the court believe that “she understood.” Thus, the court had a reasonable basis to deny the state’s cause challenge.
However, just because the court believed that juror 23 understood did not require the state to adhere to that belief. Rather, the state was entitled to maintain its “genuine[] belie[f] that she did not [understand].” Thus, when the state exercised its peremptory challenge, the court’s focus was “on the genuineness of the race-neutral explanation as opposed to its reasonableness.” Hayes, 94 So.3d at 462 (citation omitted). The defense, as the opponent of the strike, bore the burden “to demonstrate why the reason was not genuine.” Id. The defense argued that the state had used peremptory strikes on four other African-American jurors. While prior strikes exercised against the same racial group is a relevant circumstance which may be considered in determining whether the proffered reason for the strike is genuine, the exercise of such prior strikes is not wholly determinative. See id. (“The proper test under Melbourne requires the trial court’s decision on the ultimate issue of pretext to turn on a judicial assessment of the credibility of the proffered reasons and the attorney or party proffering them, both of which must be weighed in light of the circumstances of the case and the total course of the voir dire in question, as reflected in the record.”) (citations and internal quotations omitted).
Here, given the judge’s initial concern that juror 23 did not understand the proceedings, it was possible for the court to recognize that the state remained unconvinced of juror 23’s ability to understand the proceedings. Thus, there was nothing contradictory about the court finding the state’s reason insufficient for a cause challenge but sufficient for a peremptory challenge. Cf. id. at 465 (concluding that the trial court misapplied Melbourne by employing a for-cause analysis to a peremptory challenge rather than undertaking a peremptory-challenge analysis).
*823 Second, the state’s proffered reason for striking juror 23 applied to only one other person, who also was stricken, albeit for a different reason. That other person was juror 2. In response to the questionnaire which asked for her opinion about the insanity defense, juror 2 responded, “I don’t know.” When the state asked her to explain her response, juror 2 replied, “I don’t know what insanity means.... That’s why I didn’t answer it.” Ultimately, the parties agreed to strike juror 2 because she had a child care issue. However, she was the only other juror who, like juror 23, expressed a lack of understanding of the word “insanity.”
Third, the record indicates that the court considered relevant circumstances in determining whether the state’s proffered reasons for striking other African-American jurors were genuine. “Relevant circumstances may include — but are not limited to — the following: the racial make-up of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged juror; or singling the juror out for special treatment.” Id. at 462 (citations omitted). The following is a summary of the consideration which the court gave to each African-American juror whom the state struck before striking juror 23:
• The state used its first peremptory strike on juror 5. Juror 5, without being prompted, stated during voir dire that he was too young to serve because he was nineteen years old. In his words, “I don’t think I should be in here.... I’m not ready for all this. This is too much.... And I’m missing school.... I just think I’m too young ... I’m still a child, so the age do bother me.” When the state used its peremptory challenge on juror 5, the defense did not raise a Melbourne objection.
• The state used its second peremptory strike on juror 3. The defense raised a Melbourne objection. The court asked the state to provide a race-neutral reason for the strike. The state responded that juror 3 indicated on her juror questionnaire that: (1) her son had been arrested and had a violation of probation; and (2) a defendant’s age should be taken into account when rendering an opinion on a case. The defense argued that juror 3 was the second African-American juror whom the state sought to strike. The court found that the state’s reasons were facially race-neutral and were not a pretext. In making that finding, the court noted that African-American females remained on the panel.
• The state used its third peremptory strike on juror 7. The defense raised a Melbourne objection. The court asked the state to provide a race-neutral reason for the strike. The state responded that juror 7:(1) arrived an hour-and-a-half late and did not hear most of its voir dire; and (2) had been arrested for driving under the influence. The defense argued that there were “a number of other jurors that have issues regarding arrests,” and that juror 7 was the third African-American juror whom the state sought to strike. The court found that the state’s reasons were facially race-neutral and were not a pretext. In making that finding, the court noted that juror 1, who remained on the panel, also had a prior arrest. However, the court also noted that the state was correct in its observation that juror 7 missed more than an hour-and-a-half of the state’s voir dire. The court further noted that African-American females remained on the panel.
• The state used its fourth peremptory strike on juror 6. Juror 6 wrote on *824 her jury questionnaire that she did not admire lawyers. When the state asked her to explain that comment, she responded that “lawyers don’t have to tell the truth.” Later, when the state asked if anyone on the panel would have a problem following the law if they did not agree with it, juror 6 responded that “if the law is against my biblical belief, then my biblical belief would take precedence.” When the defense followed up with juror 6 regarding her opinion about lawyers, she responded, “I think lawyers do what they have to do to get the most money that they can.... And they withhold information.... [Ljawyers always have to probably twist the truth or bend the truth or tell lies, whatever it is to win a case.” When the defense followed up with juror 6 regarding her religious beliefs, she responded that “if the rules of the land is such that they contradict the rules that I live by, then I have an obligation to live according to the rules of my God.” When the state used its peremptory challenge on juror 6, the defense did not raise a Melbourne objection.
Fourth, this case is distinguishable from Nowell, upon which the defendant relies, where a trial court improperly allowed the state to exercise a peremptory strike. In that case, the state sought to exercise a peremptory strike upon a Hispanic juror. The defense raised a Melbourne objection. The state gave two reasons for the strike: (1) the juror “would relate to the defendant” because they were of a similar young age; and (2) the juror’s wife worked for a childcare nurturing facility, and that “based on philosophies within the family ... he may not be able to follow the law.” 998 So.2d at 603. The trial court asked the state to identify the juror’s specific answers which raised such concerns. The state responded, “There [are] no specific answers.” Id. (emphasis omitted). The state then gave a third reason: “I don’t particularly like him, I don’t think he is going to be the kind of juror that I would like.” Id. (emphasis omitted). The court asked if there were white male jurors of a similar young age whom the state did not strike. The parties agreed that one such juror still was present. The court then, without explanation, allowed the state to exercise the peremptory strike on the Hispanic juror.
The supreme court held that the trial court’s decision to allow the strike was clearly erroneous for three reasons: (1) striking the Hispanic juror based on his young age was a reason equally applicable to a white juror whom the state did not strike, and neither gave any responses indicating that they would identify with the defendant; (2) the Hispanic juror did not make any statements indicating that he could not follow the law and, in fact, stated he would follow the law; and (3) “Florida courts have consistently rejected a general feeling or ‘dislike’ of a juror as a genuine race-neutral reason.” Id. at 604-05 (citations omitted).
Nowell is distinguishable from this case. Here, striking juror 23 based on her lack of understanding of the word “insanity” was a reason equally applicable to juror 2, but juror 2 also was stricken, albeit for a different reason, that is, because she had a child care issue. Further, juror 23 made statements supporting the state’s reason for the strike. She stated in her questionnaire responses that she did not understand the word “insanity.” Then when the state asked juror 23 if she was “having any trouble understanding us,” she responded “I stand — I stand — understand some of it.... Not a lot.” Lastly, the state did not proffer a general feeling or “dislike” for juror 23. Rather, the state relied on the record to support its reason for the strike.
*825 Fifth, this case also is distinguishable from Siegel and Hayes, where trial courts improperly disallowed defendants from exercising peremptory strikes. In those cases, the defendants sought to use peremptory strikes on female prospective jurors. The state raised Melbourne objections as to each juror and asked for gender-neutral reasons for the strikes. The defendants provided facially gender-neutral reasons for each strike. Thus, at that point, the state — as the opponent of the strike — had the burden to demonstrate why those reasons were pretextual. The trial courts, however, did not hold the state to its burden. Instead, the trial courts, without explanation, found the reasons were pretextual and disallowed the defendants from exercising the peremptory strikes. As a result, the jurors whom the defendants sought to strike sat on their respective juries.
In Siegel, we reversed for a new trial, reasoning in pertinent part:
There is nothing in Melbourne which requires trial judges to articulate their thought process on the issue of pretext. But where a gender or race neutral reason was advanced for the strike, the reason advanced is itself reasonable, and the record is devoid of any indication that the trial judge considered the relevant circumstances surrounding the strike in concluding that it was motivated by improper purposes, an appellate court must conclude that the trial judge failed to adequately engage in the genuineness inquiry mandated by Melbourne
[[Image here]]
68 So.3d at 286 (internal citations and quotations omitted).
In Hayes, the supreme court also concluded that the proper remedy was a new trial, reasoning in pertinent part:
The trial court mistakenly assessed defense counsel’s reason as if it were assessing a challenge for cause and failed to perform the critical third step of the Melbourne procedure, which requires an assessment of the genuineness of counsel’s proffered reasons for the strike. Further, the trial court erroneously relieved the State — the opponent of the strike — of its burden to establish that the reason for the challenge, despite being gender-neutral, was pretextual.
94 So.3d at 455.
Siegel and Hayes are distinguishable from this case. The trial courts in Siegel and Hayes erroneously relieved the State — the opponent of the strike — of its burden to establish that the reasons for the strikes were pretextual. Here, however, the trial court held the defendant — the opponent of the strike — to her burden to establish that the state’s reasons for striking juror 23 were pretextual. The defendant did not meet that burden, as we discussed above.
Perhaps more importantly, the effect of the trial court’s decisions in Siegel and Hayes was wholly opposite from the effect of the trial court’s decision in this case. In Siegel and Hayes, the effect of the trial courts’ decisions was to prohibit a defendant from striking jurors despite the absence of evidence of discriminatory intent, thereby allowing those jurors to sit on the respective juries. Prohibiting a defendant from striking a juror, despite the absence of evidence of discriminatory intent, was of particular concern to our supreme court in Hayes. As the court stated, it has “long recognized that [peremptory] challenges are ... one of the most important rights secured to the accused.” 94 So.3d at 463 (citation and internal quotations omitted). “Affording a criminal defendant the full use of his or her allotted peremptory challenges is an essential part of securing a fair and impartial jury under Florida’s constitution, and his or her use of peremptory *826 challenges is limited only by the rule that such challenges may not be used to exclude prospective jurors because of their race, ethnicity, or gender.” Id. (citations omitted). That concern appears to have led the court to later state in Hayes: “Compliance with each step [of Melbourne ] is not discretionary, and the proper remedy when the trial court fails to abide by its duty under the Melbourne procedure is to reverse and remand for a new trial.” Id. (citations omitted).
Here, on the other hand, the effect of the trial court’s decision was to allow the state to exclude a prospective juror from the jury. The supreme court has long held that “the accused has a right to an impartial jury but is not entitled to any particular persons as jurors.” Penn v. State, 574 So.2d 1079, 1081 (Fla.1991) (citations omitted). Here, the defendant has not shown that the striking of juror 23 prevented her from having an impartial jury. Rather, she received a trial before a jury of six impartial persons to whom she had no objection.
By this opinion, we do not mean to suggest that peremptory challenges may be used to discriminate against distinct groups of individuals as long as the jury ultimately selected is fair and impartial. Indeed, we recognize that “the reason for the Melbourne inquiry is to prevent discrimination against distinct groups of individuals through the use of peremptory challenges.” 94 So.3d at 467. “Potential jurors also have an equal protection right under both the state and federal constitutions to jury selection procedures free from stereotypical presumptions that reflect and reinforce patterns of historical discrimination.” Nowell, 998 So.2d at 601 (citations and internal quotations omitted).
Here, however, the defendant, as the opponent of the strike, did not meet her burden to demonstrate that the state’s race-neutral reason for striking juror 23 was not genuine. Although the defense correctly argued that juror 23 was the fifth African-American which the state struck, the record reflects that race-neutral reasons existed for each of the five strikes. It is was within the trial court’s discretion to assess the credibility of the proffered reasons and determine whether these reasons were genuine in light of the circumstances of the case and the total course of the voir dire in question. The court here made that ruling.
We have conducted our own review of the record and agree with the trial court’s ruling. The record indicates that, when the defense raised Melbourne objections to jurors 3 and 7, the court referred to relevant circumstances — including the racial make-up of the venire, prior strikes exercised against the same racial group, and a strike based on a reason equally applicable to an unchallenged juror — in determining that the state’s proffered reasons for striking those jurors were genuine. The fact that the trial court did not incant magic words to indicate that it considered the same circumstances when striking juror 23 does not suggest to us that the court did not undertake a genuineness inquiry at that time. Cf. Tetreault v. State, 24 So.3d 1242, 1244 (Fla. 1st DCA 2009) (“[T]he court below bypassed the third step in the Melbourne analysis and focused solely on the fact that the State’s reasons behind its peremptory strikes were gender-neutral. [The court] did not make a finding, implicit or otherwise, that the gender-neutral reasons were genuine.”).
In reaching our conclusion, we have not simply rubber-stamped the trial court’s ruling. See Hayes, 94 So.3d at 462 (“[T]he clearly erroneous standard is not a mechanism through which appellate courts can simply rubber-stamp the trial court’s ruling.”). Nor have we simply paid deference *827 to the trial court s assessment. See id. (“[Although the trial court is in the best position to assess the genuineness of the reason advanced, and the decision will be affirmed unless clearly erroneous ... deference does not imply abandonment or abdication of judicial review ... because deference does not by definition preclude relief.”) (citation and internal quotations omitted). Instead, we have reviewed the entire voir dire and jury selection from start to finish. After considering all relevant circumstances, we have concluded that the trial court’s finding was not clearly erroneous or an abuse of discretion.

Affirmed.

CIKLIN and LEVINE, JJ„ concur.